IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

LISA ADAMSON, Individually and as
Special Administratrix of the Estate of
CHARLES ADAMSON, Deceased                                    PLAINTIFF

                v.          Civil No. 07-1081

WADLEY HEALTH SYSTEM;
WADLEY REGIONAL MEDICAL CENTER;
WADLEY HEALTH SYSTEM MANAGED
HEALTH CARE EMPLOYEE BENEFIT
PLAN; WEBTPA EMPLOYER SERVICES,
LLC; AMERICAN HEALTH HOLDING, INC.;
and MICHAEL POTTER                                           DEFENDANTS

## O R D E R

Now on this 20th day of October, 2008, comes on for consideration the captioned matter, and from the pleadings, the Administrative Record, and the briefs of the parties, the Court finds and orders as follows:

1. Plaintiff Lisa Adamson brought suit under the Employee Retirement Income Security Act ("ERISA") to recover benefits allegedly due her under the Wadley Health System Managed Health Care Employee Benefit Plan, pursuant to **28 U.S.C. §1132(a)(1)(B)**. She also alleges violation of the duty to provide requested Plan information under **28 U.S.C. §1132(c)(1)**, intentional infliction of emotional distress, and negligent misrepresentation under Texas law.

All defendants denied the material allegations of the Amended Complaint, and defendant WebTPA Employer Services, LLC ("WebTPA"),

crossclaimed against the Wadley Defendants for breach of a contract to defend and indemnify.

2.    The Court will commence by taking up the contentions of several defendants that they are not proper parties to this litigation.

Defendant WebTPA seeks to be dismissed, pointing out that it is merely the Plan's claims' administrator, paying claims in accordance with "the Plan's rules as established by the Plan Administer [sic], the CEO of Wadley Health System." WebTPA asserts that it did not make the decision to deny benefits, and is not a fiduciary under the terms of the Plan. WebTPA also points out that Plaintiff does not address her claim against it in the brief submitted to the Court.

Defendant American Health Holding, Inc. ("AHH"), also contends that it should be dismissed because it was not involved in the decision to deny benefits, pointing out that the proper defendant in an ERISA case is the party which controls administration of the plan, citing **Layes v. Mead Corp.**, **132 F.3d 1246 (8th Cir. 1998)**. But see **Ross v. Rail Car America Group Disability Income Plan**, **285 F.3d 735, 740 (8th Cir. 2002)**("employee benefit plan itself is ordinarily liable for benefits payable under the terms of the plan and is thus the primary defendant" in suit brought under **29 U.S.C. §1132(a)(1)**).

AHH contends that it simply determines whether medical

procedures appear to be necessary, but makes no determination as to whether those procedures are covered by the Plan.  AHH also points out that Plaintiff did not address her claims against it in the brief submitted to the Court.

Plaintiff does not contest the assertions of either WebTPA or AHH, and the Court concludes that Plaintiff's claims against these defendants should be dismissed.  The Court also finds that WebTPA's crossclaim against Wadley Health System and Wadley Regional Medical Center should be dismissed, given that it is predicated on the chance that plaintiff might recover damages against WebTPA.

3.  The remaining defendants are all associated with defendant Wadley Health System ("WHS"), which maintains an ERISA benefits plan for its employees.  These defendants will be collectively referred to as "the Wadley Defendants."

The decision of the Plan Administrator to deny benefits to Plaintiff is challenged on this administrative appeal. The following facts, as shown by the Administrative Record, outline and frame the issues presented.

* Plaintiff Lisa Adamson ("Plaintiff" or "Lisa") was, at all relevant times, an employee of WHS and a participant in the Wadley Health System Managed Care Employee Benefit Plan (the "Plan").

* Lisa's husband, Charles ("Charles"), was a beneficiary

-3-

under the Plan, by virtue of his marriage to Lisa.

* WHS is the Plan Sponsor and its Chief Executive Officer Michael Potter ("Potter") is the Plan Administrator.  It is the responsibility of the Plan Administrator to administer the Plan in accordance with its terms.

* Web-TPA was the Plan's Claims Administrator, whose duty was to pay claims.

* AHH provided utilization review services to the Plan, including the services of certifying and authorizing medical services for Plan participants.

* The Plan is funded by WHS and the contributions of covered employees.

* Charles was diagnosed with gastric adenocarcinoma in May, 2005.  When the events in suit began, he was undergoing an outpatient course of chemotherapy at M.D. Anderson in Houston, and was scheduled to return for a chemotherapy treatment on Friday, September 2, 2005.

* On August 31, 2005, Charles presented to the emergency room of Springhill Medical Center ("Springhill Medical"), a small rural hospital in Springhill, Louisiana [1], with weakness, nausea, and vomiting.  The emergency room physician diagnosed him with

---

[1]Springhill, Louisiana, is just across the Arkansas/Louisiana border close to the Adamson's home in Taylor, Arkansas.

-4-

acute gastroenteritis[2]. He was seen the following morning by Dr. Leamon Torrence, who stated "it was quite apparent that the patient was much more ill than the usual acute gastroenteritis. In particular, he was febrile, dehydrated, and experiencing unrelenting abdominal pain and vomiting. He had multiple metabolic abnormalities, as well."

     * Lisa and Charles requested transfer to a hematology/oncology service, which was not available at Springhill Medical, and Dr. Torrence concurred. Unfortunately, however, as pointed out by Dr. Torrence in a letter dated February 16, 2006, "at this point in time, our region was in the midst of caring for an [sic] large number of evacuees from south Louisiana, as a result of Hurricane Katrina." Although Charles was a cancer patient at M.D. Anderson, that hospital could not accept him for the same reason. Dr. Torrence contacted a hematologist/oncologist at Christus Shumpert, in Shreveport, Louisiana (an M.D. Anderson affiliate), but they were likewise unable to accept the transfer because "their oncology service had been overwhelmed by Hurricane Katrina evacuees." Dr. Torrence stated that "[i]t became obvious that in order to facilitate a timely transfer of the patient and avoid possibly sacrificing his care, we might have to transfer him to a facility outside his health care plan." Baptist Health Medical Center in Little Rock ("Baptist Health") was contacted,

---

[2]"Inflammation of the mucous membrane of both stomach and intestine." Stedman's Medical Dictionary, 28th Ed.

and agreed to accept the transfer.  Dr. Torrence stated "[i]t is unfortunate that he had to be transferred to a hospital outside his healthcare plan, but this was unavoidable at the time, given the very difficult circumstances all of us were working under due to the catastrophe of Hurricane Katrina."

* Charles was admitted to Baptist Health on September 1, 2005.  It was determined that he had a bowel obstruction, for which he underwent surgery on September 8, 2005.  The medical record reports that "[p]ostoperatively, he did fairly poorly.  It was a stormy postoperative course with pain, sedation, fever, sepsis, and he never really did rally."  Charles passed away on October 1, 2005, never having left Baptist Health.

* Charles' treating physician at Baptist Health, Dr. Lawrence Mendelsohn, certified that the transfer to Baptist Health "was appropriate based on everybody else's responses to Hurricane Katrina and certainly medically necessary."

* Baptist Health is not an in-network provider for the Plan.  Two other Little Rock hospitals, St. Vincent and UAMS, are in-network providers for the Plan.  Baptist Health is, however, in-network with PHCS, which appears to be the primary network provider for the Plan.[3]

* While Charles was hospitalized at Baptist Health,

---

[3]Neither the Administrative Record nor the briefs of the parties shed any light on the arcana of insurance company networks, leaving the Court to draw such conclusions as it can from the sketchy notes of representatives of the parties found in the Administrative Record.

representatives of that hospital exchanged telephone calls and e-mails with representatives of WHS, the Plan, WebTPA, and AHH relative to Charles' insurance coverage. Representatives of WebTPA and/or AHH repeatedly certified Charles' continued care at Baptist Health, while representatives of WHS and the Plan gave conflicting information on his eligibility for benefits during the Baptist Health hospitalization.

     * After 4 p.m. on September 7, 2005 (the day before Charles underwent the bowel surgery from which he never rallied), Shelly Dorsett ("Dorsett") called from Wadley Regional and informed Shirley Henry of Baptist Health that "PT IS OUT OF NETWORK....DOESN'T HAVE ANY OUT OF NETWORK BENEFITS...S[AI]D PT MAY BE TRANSFERRED TO EITHER ST. VINCENT'S OR UAMS." (Capitalization in original.)

     * On September 8, 2005, Keo Baus of WebTPA notified Jessie at Baptist Health to contact Dorsett to "obtain an authorization number."

     * On September 16, 2005, Autumn Phillips of Baptist Health noted a call from Nicole at WHS, to the effect that Charles had Out-of-Area coverage; and that "WE ARE IN NETWORK WITH ONE OF THE NETWORKS (PHCS, NOVASYS), SO PT IS CONSIDERED IN NETWORK." (Capitalization in original.) Nicole's note that same date was that an "authorization number is required to obtain the higher benefit level on the secondary and/or additional networks," and

could be obtained from Dorsett, but that "[i]f enrolled in the OOA[4] plan, an auth from Shelly Dorsett is not required for PHCS/Novasys."

* A note from Jennifer Cantrell dated September 19, 2005, indicates "NovaSys in Arkansas Only***MUST get an authorization from Shelly Dorsett when accessing a Novasys provider."

* On September 19, 2005, Dorsett noted "Baptist says they spoke to Nicole at Webtpa and they feel like Nicole told them the claim would be paid.  Her notes do not indicate that.  Anyway, Baptist and the member have been told many times that they are out of network and there are no out of network benefits.  Please be sure the claim is denied according to how the plan is written."

Angie of WebTPA replied "I have put a member hold on him [Charles] for the dates of his confinement.  We will also be denying all professional fees, even those from PHCS providers.  This is based on a memo dated 1-17-2001 from James Summersett, III.  It states that ..'any use of a non-network facility except for emergency or precertified service will be paid at out-of-network reimbursement levels for both facility and professional care rendered during the episode of care.' As you are aware, non-network benefit is zero."

* On September 20, 2005, Melanie Cates of Baptist Health was asked to contact Dorsett.  Dorsett told Cates that "she has

_____

[4]This abbreviation refers to the Out-of-Area plan, in which Lisa was enrolled.

-8-

tried to work w/several people to get this pt. transferred to in network. States she told Shirley Henry on 9/7 that pt. needed to be trans. . . . Shelly states she has continuously tried to let someone know pt. is out of network. Pt. is in Novaysis [sic] network in Arkansas. PHCS is network for other states." Cates suggested that she and Dorsett negotiate a discount for the Baptist Health bill. Cates also noted that Tony Shields in Case Management reported that Charles had spiking temperatures and an elevated white count and "doesn't need to be transferred."

* Dorsett called Cates back later on September 20 and said she had spoken with the Plan Administrator, who "states will stand with health plan guidelines, pt. is out of network. Pt. can appeal if he wants to appeal." Dorsett offered assistance in transferring Charles to a Novasys provider.

* Becky Conner at WebTPA noted on the 20th that Lisa was "having trouble" with Dorsett. "Shelly called the hospital and told them that they did not have any coverage. Autumn Phillips called and spoke with Nicole and Nicole gave her benefits - and gave authorization for the confinement. Shelly called the hospital again stating the information given was incorrect and she has to give auth since it is Novasys contracted provider." This note also states "[i]f enrolled in the OOA plan, an auth from Shelly Dorsett is not required for PHCS/Novasys."

* After a review of various documents, on September 20,

2005, Baptist Health notified Lisa of the insurance problem, and sought her agreement to transfer Charles. Lisa did not agree to the transfer, and indicated she planned to review the Plan for "a clause she said that will allow coverage at our facility." Louise Monday at Baptist Health told Lisa she would call Dorsett or her supervisor and discuss the situation.

*     Dorsett told Monday that she had tried to work with Baptist Health staff since September 7, "but it seems we are not trying to work with her." Dorsett explained that the insurance card shows that Novasys is the contract in force in Arkansas, and that PHCS is for Texas and Louisiana only[5], and that "she is trying to help the wife not have a hugh [sic] medical bill to have to deal with and allow the pt to be moved to St Vin or UAMS as the only hospitals with Novasys contracts." Negotiating payment was discussed but Dorsett said "what Michelle offered was not anywhere close to what Novasys would discount."

*     Monday also spoke on September 20 with Debra Deberly at Springhill Medical, who said that she had "call ins before pt was moved and was told pt could be transferred to B[aptist] H[ealth]."

*     On September 21, 2005, Monday talked with Dorsett, and offered to accept in payment the amount that would be paid if

_____

[5]It is not clear how Dorsett reaches this conclusion from the actual language of the Insurance Card, which carries the notation:  "All services must be provided by a PHCS provider unless you are within the TexNet service area, in which case a TexNet provider must be utilized or if you are within the state of Arkansas, you must utilize a NovaSys provider."

Charles were hospitalized in Louisiana.  A note that same day from Dorsett states "IF ANY OTHER QUESTIONS, MBR [member] NEED TO CONTACT SHELLY DIRECTLY." (Capitalization in original.)  Lisa called "C. Schon"[6] that same day and asked to speak to a supervisor.  Schon "advised i would not transfer her to a supv. this email came directly from shelly. . . ."

*   On September 28, 2005, Cates contacted Dorsett about the offer of payment made on the 21st.  It was refused.  When Cates asked why the Plan was not willing to negotiate, Dorsett said it was because Lisa was not willing to transfer Charles to an in-network provider, and wanted to transfer him to M.D. Anderson "when ready."

*   A WebTPA note dated October 3, 2005, stated "hospital gave her her [sic] the pre auth number of 179895 see referral 09072005msw0025 - the hospital did get authorization does each doctor have to get seperate [sic] authorization."  The response: "no auth from Shelly."

*   Charles died on October 5, 2005, never having left Baptist Health.

*   On March 1, 2006, attorney Geoff Culbertson presented a letter appeal to Potter on behalf of Lisa.

*   The first written notice of benefits determination directed to Lisa that appears in the Administrative Record is

---

[6]It is not clear whether Schon is affiliated with WHS, the Plan, WebTPA or AHH, all of whom appear to have used the e-mail system iii:put.

dated March 20, 2006.  On that date, Potter wrote Lisa, stating that her appeal was denied because the Schedule Of Benefits "states Out-of-Network is not covered" and "[y]our insurance card states you must use the Novasys network in Arkansas to receive in-network benefits."

     *    On May 3, 2006, Potter again wrote to Lisa, stating that although there was no requirement that the Appeal Committee reconsider its denial of benefits, it had done so.  He asserted that "[t]he documents showed that you received notification, at the beginning of the hospital stay, that Baptist Hospital was not an in-network provider under your health plan," and that "the health plan and your insurance card state that Novasys is the network you must use in Arkansas to receive in-network benefits." On this basis, he said "the denial of your appeal stands."

     4.   Against this background of facts, the Court turns to the question of what standard of review applies in this case.

     The Plan provides that "[b]enefits under this Plan shall be paid only if the Plan Administrator decides in its discretion that a Covered Person is entitled to them."  Where a plan administrator has this type of discretionary authority, its eligibility decisions are ordinarily reviewed for abuse of that discretion. **Groves v. Metropolitan Life Insurance Co.**, **438 F.3d 872 (8th Cir. 2006).**

     In applying this standard, the Court must affirm the

administrative decision if a reasonable person could have reached the same decision on the evidence before the administrator, regardless of whether that hypothetical reasonable person actually would have reached the same decision. Both the quantity and the quality of the evidence is evaluated in this light, and courts are "hesitant to interfere" with the administrative decision. *Id.*

The foregoing standard is not, however, absolute and inflexible. Where a plaintiff presents "probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty," the level of deference is adjusted to take those factors into consideration. **<u>Woo v. Deluxe Corp.</u>, 144 F.3d 1157, 1160 (8th Cir. 1998).** When circumstances justify application of the sliding scale approach, "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." **144 F.3d at 1162.**

5.   Lisa contends that a conflict of interest exists in this case because WHS is both the funding sponsor of the Plan, and its administrator, and denial of benefits saved the Plan some $200,000. The Wadley Defendants respond that "[a]bsent a showing of some reversionary interest . . . it is highly unlikely that the administrator of a fund from which health benefits are paid has a true conflict of interest with respect to claimants on the fund's

-13-

assets."

Since the briefs in this case were filed, the Supreme Court decided **Metropolitan Life Insurance Co. v. Glenn**, **--- U.S. ---, 128 S.Ct. 2343 (2008),** in which it held that a situation like that in the case at bar constitutes a conflict of interest, regardless of whether it arises in a self-funded plan or in an insured plan where the insurer both determines and pays claims. Based on **Glenn**, the Court concludes that the first factor of the **Woo** test is met.

6. Lisa also contends that there were procedural irregularities in the administrative handling of this case sufficient to justify sliding scale analysis.

(a) Lisa first contends that she was not notified of the Plan's decision to contest coverage in writing within 72 hours, as required by the terms the Plan relating to Claims Procedure.

The Wadley Defendants do not contend that such a writing was given to Lisa. Instead, they take the position that no claim was filed during the time Charles was at Baptist Health, so the claims procedure does not apply and no procedural irregularity can be shown.

It appears that Shelly Dorsett was the person authorized to determine whether Charles' claim would be paid, and that she had staked out her position -- that he could not receive benefits for care received at Baptist Health -- by September 7, 2005. On September 19, Dorsett specifically directed that "the claim" be

-14-

denied.

This language is inconsistent with the Wadley Defendants' position that no claim had been made, and points up the irregularity that attended claims procedure. If a claim had been made, there was an irregularity in that the requisite written notice of denial was not furnished. If no claim had been made, Dorsett's decision to deny was procedurally irregular. *Cf.* **Kolosky v. UNUM Life Insurance Co. of America, 182 Fed. App. 607 (8th Cir. 2006)**(in determining whether procedural irregularities occurred, court considers "whether the plan administrator's decision was made without reflection or judgment, such that it was the product of an arbitrary decision or the plan administrator's whim").

In addition to the actual confusion that arose in the handling of this claim, the Court finds an inherent structural procedural irregularity in the Plan Claims Procedure relating to Urgent Care Claims[7]. The Plan provides for:

\*      oral notice of an adverse benefit determination within 72 hours in situations where treatment is needed immediately:

_____

[7]According to the Plan, "[a] Claim involving Urgent Care is any Claim for medical care or treatment where using the timetable for a non-urgent care determination could serious jeopardize the life or health of the claimant; or the ability of the claimant to regain maximum function; or in the opinion of the attending or consulting Physician, would subject the claimant to severe pain that could not be adequately managed without the care or treatment that is the subject of the Claim." While defendants appear to dispute that Charles' situation was "Urgent," the Court is persuaded by the medical evidence that it was. Charles was an end stage cancer patient only thirty days from his death, experiencing unrelenting abdominal pain and vomiting, whose treating physician deemed his immediate transfer to a tertiary health care facility medically indicated.

* oral request for expedited appeal of an adverse benefits determination; and

* submission of information necessary for such review "by telephone, facsimile, or other similarly expeditious method."

Inexplicably, however, there is no provision for telephone, facsimile, or other similarly expeditious method of *presenting* an Urgent Care Claim. The only procedure in the Plan for presenting claims requires the claimant to obtain a form, fill it out, have the doctor complete it, attach all bills, and mail it to an address in Irving, Texas.[8]

Given that a claim must include "all bills" and be submitted by mail, one wonders how an Urgent Care Claim could ever be timely presented and determined. The procedure itself is flawed, and therefore irregular.

(b) Lisa also contends that the Wadley Defendants' refusal to negotiate with Baptist Health on a reduced bill for the cost of Charles' treatment at Baptist Health is evidence of a procedural irregularity. The record reflects that on September 21, Baptist Health employee Monday offered to accept in payment for Charles' Baptist Health hospitalization the amount that would be paid if Charles were hospitalized in Louisiana. Shelly Dorsett refused, not because this amount was too high -- presumably it was reasonable, since it was the negotiated amount with an in-network

---

[8]The Insurance Card inconsistently directs that claims be mailed to an address in Grand Prairie, Texas.

provider -- but because Lisa was not willing to transfer Charles
to an in-network provider.[9]

        While this situation may not fall within the rubric of
"procedural abnormality," the Court considers it evidence that the
decisions the Plan was making with regard to Charles were
arbitrary.    Had the Plan stood to pay more for Charles'
hospitalization at Baptist Health than it would have paid had he
been able to find critical care in Louisiana, the matter would be
different.    Given the peculiar circumstances of Charles'
hospitalization -- the patient overload caused by Hurricane
Katrina; Charles' urgent need for oncological care; and the lack
of information about where such care could be provided in-network[10]
 -- the Plan's refusal to negotiate an equally beneficial payment
with an out-of-network facility is persuasive evidence that it
arbitrarily decided to take advantage of the situation to avoid
paying Charles' claim.

        (c)   Lisa also contends that a procedural irregularity arose
when defendants failed to consider the "emergency exception" to

---

[9]Although the Court has not detailed the various notations in the Administrative
Record which so indicate, it appears that Shelly Dorsett and Lisa did not have a good
working relationship, arising out of Dorsett's incorrect evaluation of Charles' coverage
when he initially fell ill and sought treatment at M.D. Anderson.  Lisa clearly did not
trust Dorsett, and Dorsett appears to have harbored a certain amount of ill will toward
Lisa.

[10]Dr. Torrence was concerned about having to transfer Charles to a hospital outside
his plan, and the Court considers it unlikely that he would willingly have done so had
he known that an acceptable alternative existed.  Nurse Deberly understood that the
transfer to Baptist Health was acceptable with Charles' plan, but it is not shown whom
she spoke with. The Insurance Card does not contain a telephone number which can be used
to locate a NovaSys provider in Arkansas.

the requirement that Plan participants use TexNex providers. This provision is found both in the Plan Document and in the Schedule of Benefits, but not on the Insurance Card.

Defendants put up a weak argument that the situation presented when Charles arrived at Springhill Medical did not constitute an emergency, but the Court rejects it. "Emergency" is a defined term under the Plan, but the definition is incoherent, see ¶13, *infra*, and the Court will rely instead on the accepted medical usage of the term. According to **Stedman's Medical Dictionary, 28th Edition**, "emergency" means "[a] patient's condition requiring immediate treatment."

Charles' condition upon presenting to Springhill Medical and the reasons for his transfer to Baptist Health, as described by Dr. Torrence, meet the medical definition of an emergency. In the absence of a usable definition in the Plan which differs from the medical definition, the Court finds that the circumstances under which Charles was transferred from Springhill Medical to Baptist Health constituted a medical emergency sufficient to trigger the emergency exceptions in the Plan Document and Schedule of Benefits.

There is no evidence in the Administrative Record that the Wadley Defendants considered the effect of the emergency exception on the benefits decision at any stage of the decision-making process. This was a serious procedural irregularity. *Cf*. **Janssen**

-18-

**v. Minneapolis Auto Dealers Benefit Fund**, 447 F.3d 1109 (8th Cir. 2006)(procedural irregularity exists where there was "no evidence that the Trustees performed a meaningful review" prior to denying benefits).

(d)  Lisa also contends that a procedural irregularity arose because defendants failed to obtain the opinion of a qualified physician in making the benefits determination, to ascertain whether Charles presented an emergency situation at Springhill Medical and whether his transfer from Baptist Health to a NovaSys provider was medically feasible.

The Wadley Defendants do not seriously contest this allegation, and it is clear that no such medical opinion was obtained.  The Court finds the Plan's failure to consider Charles' medical condition and the feasibility of transfer from Baptist Health to either UAMS or St. Vincent to be a procedural irregularity that affected the benefits decision.

(e)  Finally, Lisa contends that a procedural irregularity arose because Potter made both the initial benefits determination and the decision on review.  It appears, however, that the initial benefits decision was made not by Potter, but by Shelly Dorsett. According to Potter's letters to Lisa, the review of that decision was conducted by an "Appeals committee." The only point at which the Administrative Record reflects Potter's involvement is the cryptic notation that Dorsett called Cates of Baptist Health on

September 20 and said she had spoken with the Plan Administrator, who "states will stand with health plan guidelines, pt. is out of network.  Pt. can appeal if he wants to appeal."  The Court is not persuaded that Potter was involved at multiple levels so as to constitute a procedural irregularity.

      7.  Neither a conflict of interest nor a procedural irregularity will trigger sliding scale analysis unless it causes a serious breach of the Plan Administrator's fiduciary duty, and it is to that issue that the Court next turns its attention.

> The alleged procedural irregularity must have some connection to the substantive decision reached by the administrator, and give rise to "serious doubts" about whether the result reached was the product of "an arbitrary decision" or "whim," before we vary from the usual standard of review.

**LaSalle v. Mercantile Bancorporation, Inc. Long Term Disability Plan**, 498 F.3d 805, 809 (8th Cir. 2007).  It has been said that "any alleged procedural irregularity must be so egregious that it might create a 'total lack of faith in the integrity of the decision making process'."  **Hillery v. Metropolitan Life Insurance Co.**, 453 F.3d 1087, 1090 (8th Cir. 2006), citing **Layes v. Mead Corp.**, 132 F.3d 1246, 1251 (8th Cir. 1998).

      In the case at bar, the Court believes these considerable hurdles have been cleared.  The nexus between conflict of interest and breach of duty inheres in the fact that denial of benefits in this case resulted in saving the Plan some $200,000.00.  Had the

Plan stood to save only a minor sum of money, the Court might not be inclined to find that breach was induced by the prospect thereof, but such a large sum creates serious doubt that the benefits decision was reasonable. This is particularly true in the face of evidence that the cost to the Plan for Charles' out-of-network care could have been negotiated down to the cost of in-network care, but Plan officials declined to negotiate.

The nexus between the procedural irregularities and the breach of duty arises out of the combined impact of the various irregularities noted above.

*    If the Insurance Card had given a phone number to assist Springhill Medical in locating a NovaSys provider in Arkansas, the Court considers it more likely than not that Charles would have been transferred from Springhill Medical to St. Vincent or UAMS rather than Baptist Health.

*    If Lisa had received notice of the out-of-network issue within 72 hours of Charles' admission to Baptist Health -- before his condition deteriorated -- transfer to St. Vincent or UAMS might well have been feasible.

*    Had the Plan obtained a medical expert it could have made a reasoned decision about the feasibility of the transfer at a later date.

*    Had the Plan considered the emergency exception, it might well have found benefits appropriate, especially in light of

-21-

the possibility for negotiating the bill.

As it was, each of these procedural irregularities inured to the benefit of the Plan, giving it multiple openings to deny Charles' claim without fully considering all the facts, and thus to keep the funds it would otherwise have paid out.

The Court concludes that both conflict of interest and procedural irregularities exist; that both are causally connected to the benefits decision; and that they are of sufficient magnitude that the Court has little faith in the integrity of the decision making process. Indeed, the Court harbors serious doubts about whether the benefits decision was reasonable. For this reason, the Court concludes that the Plan Administrator's decision in this matter is entitled to relatively little deference.

8.   The Court now turns to the actual benefits decision, and the substantive issue of whether it should be affirmed. As noted above, where an ERISA plan gives the plan administrator discretion to determine benefits, that decision must be affirmed if it is reasonable, i.e., if a reasonable person could have reached the same decision on the evidence. In deciding whether a benefits determination is reasonable, the following considerations are appropriate:

*   Is the decision consistent with the goals of the Plan?

*   Does the decision render any language in the Plan meaningless or internally inconsistent?

-22-

* Does it conflict with the substantive or procedural requirements of the ERISA statute?

* Has the Plan been interpreted consistently?

* Is the decision contrary to the clear language of the Plan?

**Finley v. Special Agents Mutual Benefit Association, Inc.**, **957 F.2d 617, 621 (8th Cir. 1992).**

An examination of these factors, in light of the reduced deference appropriate in the circumstances of this case, persuades the Court that the Plan Administrator's denial of benefits in this case is not reasonable.

(a)   <u>Is the decision consistent with the goals of the Plan?</u>

The stated goal of the Plan, according to the Introduction to the Plan Document, is "to protect Plan Participants against certain catastrophic health expenses."  Because the benefits decision exposed Lisa to the catastrophic expenses of Charles' last illness, it was arguably inconsistent with the stated goal of the Plan.  However, because an ERISA plan is concerned with protecting all beneficiaries, and an erroneous decision to pay a claim might imperil that ability, **Barnhart v. UNUM Life Insurance Co. of America**, **179 F.3d 583 (8th Cir. 1999),** this factor is not entirely clearcut.  It only becomes so in light of the other factors.

(b)   <u>Does the decision render any language in the Plan</u>

meaningless or internally inconsistent?

The decision renders Plan language[11] relating to the emergency exception either meaningless or internally inconsistent. Potter informed Lisa that benefits were being denied because the Schedule of Benefits "states Out-of-Network is not covered"; "[y]our insurance card states you must use the Novasys network in Arkansas to receive in-network benefits"; and "the health plan and your insurance card state that Novasys is the network you must use in Arkansas to receive in-network benefits."

While the Schedule of Benefits does show Out-of-Network services as being "Not Covered," it also states

> To receive benefits, you must access your appropriate TexNet provider.  If the service cannot be rendered by a TexNet provider, then you must contact Managed Care at 798-8873 for assistance.  **This does not apply in an emergency situation.**

(Emphasis supplied.)

Virtually identical language is found in the Plan Document.

The Insurance Card states that its holder must "utilize a

---

[11]In <u>Administrative Committee of Wal-Mart Stores, Inc. Associates Health and Welfare Plan v. Gamboa</u>, 479 F.3d 538 (2007), the Court noted that:

> identifying "the plan" is not always a clear-cut task.  [O]ften the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as "the plan."  Unfortunately, [t]his kind of confusion is all too common in ERISA land.

479 F.3d at 542 (internal citations and quotation marks omitted).

In the case at bar, the Plan Administrator interpreted the Plan as containing the language found in the Plan Document And Summary Plan Description For Wadley Health System Managed Health Care Employee Benefit Plan (the "Plan Document"), the Schedule Of Benefits, and the Insurance Card which was given to plaintiff.  The Court has done likewise.

-24-

NovaSys provider" for services in Arkansas, but it does not contain the emergency exception.

To the extent the Schedule of Benefits and Plan Document control, the Insurance Card is inconsistent. To the extent the Insurance Card controls, it renders the emergency exception language of the Plan Document and the Schedule of Benefits meaningless.

(c) <u>Does the decision conflict with the substantive or procedural requirements of the ERISA statute?</u>

The decision conflicts with the procedural requirements of the ERISA statute, insofar as those requirements have been fleshed out by regulation. The requirements for notification of a denial of benefits are set out at **29 C.F.R. §2560.503-1(g)(1),** and include written or electronic notice of the denial including specific reasons, specific plan provisions, and a description of review procedures.

In the case of an adverse benefits determination concerning a claim involving urgent care, **§2560.503-1(g)(2)** allows oral transmission of the reasons, "provided that a written or electronic notification . . . is furnished to the claimant not later than 3 days after the oral notification."

While Dorsett spoke with Lisa and with representatives of Baptist Health about the benefits dispute during Charles' stay at Baptist Health, the Administrative Record contains no document by

which Lisa was notified in writing -- within 72 hours of any date during Charles' stay at Baptist Health -- that Baptist Health was not an in-network provider or that benefits would be denied.

      (d)  <u>Has the Plan been interpreted consistently?</u>

The Administrative Record reflects that the Plan was interpreted inconsistently throughout Charles' stay at Baptist Health:

      *   Potter's denial letters state that benefits are not payable because Charles received care in an out-of-network facility -- a "hard and fast rule" approach.

      *   Dorsett took the position that out-of-network benefits were not payable because she had not authorized them -- a "follow the rule unless I tell you differently" approach.

      *   Nicole took the position that Baptist Health was in-network with one of the Plan networks, so it was considered in-network, and that for a participant enrolled in out-of-area coverage, no authorization from Dorsett was required.

      *   Becky Conner took the position that if a participant was enrolled in the Out-of-Area plan, he did not need an authorization from Dorsett to use PHCS/Novasys.

      *   Jennifer Cantrell took the position that an authorization from Dorsett was required even when using a NovaSys provider in Arkansas.

      *   The unknown person with whom Nurse Deberly spoke --

presumably someone affiliated in some respect with the Plan -- told her that Charles could be transferred to Baptist Health.

* Representatives of WebTPA and/or AHH repeatedly certified Charles' continued care at Baptist Health.

(e)   Is the decision contrary to the clear language of the Plan?

This inquiry is problematical because key portions of Plan language are not clear. The emergency exception is not clear, nor is there clear information on how to locate a NovaSys provider in Arkansas. Still more importantly, the entire concept of what constitutes an emergency, such that the emergency exception would apply, is not clear.

The Plan Document defines "Emergency" as "a condition for which services are provided in a hospital emergency facility after onset of a medical condition manifesting itself by symptoms of sufficient severity that the absence of immediate medical attention reasonably expected by a prudent layperson possessing an average knowledge of health and medicine to result in placing health in jeopardy, serious impairment to bodily functions, serious dysfunction of any bodily organ or part or development on [sic] continuance of sever [sic] pain."

This provision is beyond ambiguous -- anyone who takes the trouble to parse it will find it has no meaning at all. The addition of the words "could be" before the words "reasonably

-27-

expected" would inject meaning, as would the additional words suggested by the Wadley Defendants in their brief (substituting "may place one at risk of" for all the verbiage between "immediate medical attention" and "placing health in jeopardy"), but these are not the words of the Plan Document.

Also unclear is the following Plan provision:

> If there is an **emergency** admission to the Medical Care Facility, the patient, patient's family member, Medical Care Facility or attending Physician must contact Intracorp **within 48 hours** of the first business day after the admission.
> The utilization review administrator will determine the number of days of Medical Care Facility confinement or use of other listed medical services authorized for payment.
> **If the Covered Person does not receive authorization as explained in this section, there will be no benefit.**"

(Emphasis in original.)

There is no indication who Intracorp is, or how to reach it.

These conflicting and confusing provisions make it difficult to determine whether the denial of benefits is contrary to the *clear* language of the plan, but the Court does find that the denial is contrary to the language of the Plan, such as it is. The emergency exception is found in both the Plan Document and the Schedule of Benefits, and the Court is not persuaded that its omission from the Insurance Card effectively deletes it from the Plan. While "Emergency" is not clearly defined in the Plan, it is a word with a clear meaning to medical care providers, and Charles' condition met that definition. Under the circumstances

-28-

presented by Charles at the time of his transfer, he qualified for the emergency exception that he use a NovaSys provider in Arkansas.

9.   Because the decision of the Plan Administrator fails the five-factored **Finley** reasonableness test, the Court concludes that the Plan Administrator abused his discretion by rendering a benefits decision that is arbitrary and unreasonable, and that decision must be reversed.

10.   In addition to her claim to recover benefits, plaintiff alleges that she is entitled to penalties for the Plan Administrator's failure to furnish requested information, pursuant to **29 U.S.C. §1132(c)(1)**.   She has not, however, offered any information from which it can be determined when she specifically requested plan information, and when it was received.   That it was in fact received is shown by the filing of the Administrative Record.   In the absence of any evidence upon which to base a decision on this issue, this claim will be dismissed.

11.   Plaintiff also makes two state law claims -- intentional infliction of emotional distress, and negligent misrepresentation under Texas law -- which the Wadley Defendants argue are pre-empted by ERISA.   Both of these claims relate to the handling of the ERISA benefits claim, and both are pre-empted.   **Pilot Life Insurance Co. v. Dedeaux**, **481 U.S. 41 (1987)**.   They will, therefore, be dismissed.

-29-

**IT IS THEREFORE ORDERED** that the decision of the Administrator of the Wadley Health System Managed Health Care Employee Benefit Plan to deny benefits to Lisa Adamson for the hospitalization of Charles Adamson at Baptist Health Medical Center in Little Rock, Arkansas, is hereby **reversed**, and the matter is remanded to the Plan Administrator with directions that it process and pay Charles' claims in accordance with this Order.

**IT IS FURTHER ORDERED** that plaintiff's claims against WebTPA Employer Services, LLC, are hereby **dismissed.**

**IT IS FURTHER ORDERED** that the crossclaim of WebTPA Employer Health Services, LLC, against Wadley Health System and Wadley Regional Medical Center is hereby **dismissed.**

**IT IS FURTHER ORDERED** that plaintiff's claims against American Health Holdings, Inc., are hereby **dismissed.**

**IT IS FURTHER ORDERED** that plaintiff's claims for intentional infliction of emotional distress and negligent misrepresentation are hereby **dismissed.**

**IT IS FURTHER ORDERED** that any petition for attorney's fees be filed within fourteen (14) days of the date of this Order.

**IT IS SO ORDERED.**

  /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**

-30-